**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X
                                                                  :
BENNY KAY,                                                        :      CIVIL ACTION
                                                                  :
                                       Plaintiff,                 :      Case No.:
                                                                  :
                  -against-                                       :      **COMPLAINT**
                                                                  :
                                                                  :
LAVRY ENGINEERING, INC.,                                          :
                                                                  :
                                       Defendant.  :
                                                                  :
-------------------------------------------------------------------X

Plaintiff, BENNY KAY, by and through his attorneys CARTER REICH, PC, as and for

his complaint against Defendant, LAVRY ENGINEERING, INC., alleges and asserts in support

thereof, based upon information and belief, as follows:

### PRELIMINARY STATEMENT

1.      This is a case sounding in negligence, negligent misrepresentation, breach of the

duty of good faith and fair dealing, and violation of the Washington State Consumer Protection

Act.  Plaintiff has been harmed as a result of using a product, manufactured and sold by LAVRY,

that was negligently designed and manufactured resulting in the creation of sound recordings that

are defective and must be re-created to allow for optimal use.

2.      Defendant also knowingly mislabeled their product and then failed to inform

Plaintiff of their deviation from standard practice for a decade.   As a result, Plaintiff used the

product for ten (10) years to make over 1,100 sound recordings – all the while, unwittingly creating

defective results and material suboptimal for use. Plaintiff's personal property and a decade's

worth of work has been damaged as a direct and proximate result of LAVRY's acts and omissions.

As such, Plaintiff seeks a minimum of $583,000.00, in damages, in addition to any and other relief the Court sees fit.

## JURISDICTION

3.      This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between a citizen of New York and a business incorporated in and at home in Washington State, and the amount in controversy exceeds $75,000 exclusive of costs.

4.      In order to determine the citizenship of a corporation for diversity jurisdiction, the corporation either must have its nerve center or main office in another state, and cannot be incorporated in the State of New York. *Augienello v. F.D.I.C.*, 310 F.Supp.2d 582 (S.D.N.Y. 2004).   As Defendant is both incorporated in Washington State and has its principle place of business in Washington State, while Plaintiff is a citizen of New York, diversity is satisfied.

## PARTIES

5.      Plaintiff, BENNY KAY (hereinafter "Plaintiff" or "KAY"), is an adult resident of the City, County and State of New York.

6.      Defendant, LAVRY ENGINEERING (hereinafter "DEFENDANT" or "LAVRY"), is a business incorporated under the laws of Washington State and having its principle place of business in Poulsbo, Washington.

## VENUE

7.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) in that a substantial part of the property that is the subject of the action is situated in this district.

[continued]

## FACTS

8.     For 25 years, LAVRY has designed, manufactured, marketed and sold professional audio and hi-fidelity equipment and is considered a leader in the industry.  LAVRY is well known for its premium audio converters that convert digital audio signal into analog signal (and visa versa).

9.     In 2008, Plaintiff purchased two audio converter products directly from LAVRY, the model 4496 and model DA-10.  The model 4496 is a frame used to house four stereo converter modules, while the DA-10 is a stand-alone, stereo, digital-to-analog converter.

10.     Both the analog output from the 4496, and the DA-10 can be used to create stereo music mixes through an "analog summing buss" – a convention of workstation music production that combines individual output sources from converters into a stereo music mix.

11.     The DA-10 is delivered ready-for-use and preassembled by LAVRY.   It has a switch on the front panel allowing users the option to select "POLARITY" of "normal" or "invert".

12.     At the time the DA-10 was fabricated and sold to Plaintiff, the industry standard for wiring balanced line audio was second conductor positive (referred to as "Pin 2+"), and third conductor negative for polarity connection (**Exhibit "A"**).

13.     This is considered "normal" polarity as per industry standard. However, on the DA-10 unit purchased by Plaintiff, this configuration only occurred when the device's polarity switch was set to "invert" rather than "normal".

14.     The DA-10 was factory-wired in reverse and / or mislabeled with the second conductor of its balanced line output as return and the third conductor as positive (**Exhibit "B"**).

15.     As a result, the DA-10 unit would actually operate in what would be considered by audio engineers to be "normal" when in "invert" polarity and vice-versa.

16.     This deviation from the industry standard was not made clear by the manual or promotional materials for the DA-10 (**Exhibit "C"**).

17.     This standard was initially adopted by the Audio Engineering Society (AES) in 1993, such that by 2008 it was ubiquitous among manufacturers of audio equipment, making the design and construction of the DA-10 a true deviation from this standard.

18.     Neither at the time of purchase, nor at any time over the following nine-plus years, did LAVRY notify Plaintiff that their configuration was, in fact, the opposite of the industry standard, despite the fact that LAVRY had actual and/or constructive knowledge of the deviation it created through its negligent design and / or construction of the DA-10.

19.     It was not until after Plaintiff returned the unit to LAVRY for its ten (10) year refurbishment, that a technician from LAVRY, in an email to Plaintiff dated June 26, 2018, finally informed KAY of the need to set the DA-10 "POLARITY" switch to "invert" unless he had "special non-standard cables" that would make up for the defective design and manufacture of the DA-10 (**Exhibit D**).

20.     The fact that the "POLARITY" switch on the DA-10 deviated from the industry standard is not in dispute as LAVRY's technician disclosed to Plaintiff that the unit requires "special non-standard cables", for standard operation.

21.     "Polarity", or "phase", is vital in audio reproduction because transducers can react adversely to out-of-phase signal sources.   For example, a transient signal can cause a loud speaker to implode when signal feeding it is out-of-phase – causing mechanical challenges, including, in extreme cases, a speaker's cone hitting its frame. Also, in extreme cases, lathe-cutting of phonograph record masters can be irreparably damaged by out-of-phase signal sources as it can

cause the needle to jump, making it difficult, if not impossible, for an operator to maintain a cutting groove.

22.     The harm caused by using the DA-10 is compounded when its out-of-phase analog output is combined with the normal analog output of LAVRY's 4496 for mixing sound recordings on an "analog summing buss" – locking in out-of-phase signal into mixes.

23.     To elaborate, the 4496 modules have polarity switches that are labeled as "Pin 2+" or "Pin 3+" (instead of "normal" or "invert" as is on the DA-10) rendering them more-clear for users to assign standard polarity but opposite of the DA-10 if used in conjunction with its analog output in the "normal" setting.

24.     The use of an analog summing buss "locks in" the reverse polarity from the DA-10 as an out-of-phase component of the overall mix which then acts adversely to other in-phase components and renders the result defective and suboptimal for use.

25.     By this point in time (June, 2018), Plaintiff had used the DA-10 and 4496 on more than 1,100 mixes made over the previous ten (10) years – of which, at least 583 have been mixed and "locked in" with out-of-phase signal from the DA-10 and require remixing.

26.     Plaintiff sought the expert opinion of an audio engineer / technician who concluded that the DA-10 unit was in fact both engineered against the accepted standard, and that it resulted in the anomalies found in Plaintiff's recordings (**Exhibit E**).

27.     Anomalies created by out-of-phase mixing can be difficult to detect and can mimic anomalies attributable to other factors.  Moreover, Plaintiff had no reason to suspect that the DA-10 was the source of any anomalies because it was used with its "POLARITY" switch set to "normal".  Lastly, any knowledge regarding the labeling and configuration of the "POLARITY"

switch on the DA-10 was and is in the exclusive possession of LAVRY, and unknown to Plaintiff until June 26, 2018.   As such, this action is timely.

## CHOICE OF LAW

28.     In New York, the choice-of-law test in a tort action for a court sitting in diversity is a two-pronged one: 1) significant contacts and the jurisdiction they are located in; and 2) "whether the purpose of the law is to regulate conduct or allocate loss." *Babcock v. Jackson*, 12 N.Y.2d 473 (1963). If the rule is conduct-regulating, such as duty and standard of care, then the court will traditionally use the law of the place where the tort occurred. *Colon v. Multi-Park Corp.*, 477 F.Supp.2d 620 (S.D.N.Y. 2007).

29.     In this case, whereas Plaintiff created all of the mixes with LAVRY's products in New York City, the most significant contacts to the torts, namely the negligent designed, manufacture and mislabeling of the DA-10, are in the state of Washington. Further, the laws of Negligence, Negligent Misrepresentation, and the Consumer Protection Act are all conduct-regulating. Thus, the laws of Washington should be applied in this case.

## COUNT ONE
## (NEGLIGENCE)

30.     Plaintiff incorporates by reference all of the averments contained in Paragraphs "1" through "29", as if fully set forth herein.

31.     In order to show basic negligence, one must show four elements: "(1) the existence of a duty; (2) breach of that duty; (3) resulting injury; and (4) proximate cause." *Ranger Ins. Co. v. Pierce Cty.*, 164 Wash.2d 545 (2008) (quoting *Degel v. Majestic Mobile Manor, Inc.*, 129 Wash.2d 43 (1996)).

32.     When considering negligence in a products liability context, the elements are slightly altered. These elements are: "(a) the offer of sale of the product by a retailer, (b) a duty of care in the retailer, (c) a failure by act or omission to perform the duty, (d) an injury occurring from use of the product and (e) a proximate cause of the injury was a fail-to-perform the duty. *Martin v. Schoonover*, 13 Wash.App. 48 (Ct. of App. Div. 1 1975).

33.     "[T]he more a retailer takes an active part in preparing the product for final use and takes the role of a manufacturer or assembler, the more likely he can be found liable in negligence. *Id*. at 54. As LAVRY is both the merchant and manufacturer in this case, it is clear they owed the highest duty to Plaintiff.

34.     The first element is easily proven as LAVRY continues to offer this model (or subsequent revisions of same, i.e. the DA-11) for sale on their website.

35.     As for the second element, LAVRY owed a duty of care to Plaintiff, and others, to manufacture and sell equipment suitable for its stated purpose.   LAVRY also owed a duty of care to Plaintiff, and others, to manufacture and sell equipment that would not cause damage to the audio recordings LAVRY's customers were invariably creating with its equipment.   Lastly, LAVRY owed a duty to Plaintiff, and others, to label its equipment to allow for proper use by the end-user.

36.     In each and every instance LAVRY breached the duty of care owed to Plaintiff by manufacturing and selling the DA-10 unit with a polarity configuration that is opposite of the standard configuration, and which could not be corrected without the use of "special non-standard cables"; by manufacturing and selling equipment that is likely to cause irreparable damage to its customer's recordings; and, by failing to properly indicate on the unit that when the Polarity is set to normal, it is actually set to inverse, and vice versa.

37.     Plaintiff, who through no fault of his own recorded over 1,100 mixes using the DA-10 and who now must pay, at a minimum, $583,000, to correct the defective mixes, sustained damages as a direct and proximate result of Defendant's negligence.

38.     By reason of the foregoing, Defendant is liable to Plaintiff in the amount of $583,000, plus attorney's fees and costs, as well as any equitable relief deemed appropriate by the court.

## COUNT TWO
## (NEGLIGENT MISREPRESENTATION)

39.     Plaintiff incorporates by reference all of the averments contained in Paragraphs "1" through "38" as if fully set forth herein.

40.     A cause of action for Negligent Misrepresentation involves six elements under Washington State Law. The six elements are: 1) supplying of information that is false; 2) the defendant knew or should have known the information was false; 3) the defendant was negligent in obtaining or communicating the false information; 4) plaintiff's reliance on the information; 5) the reliance was reasonable; and 6) the false information proximately caused the plaintiff's damages. *Merriman v. American Guarantee & Liability Insurance Company*, 198 Wash.App. 594 (3d Div. 2017) (quoting *Ross v. Kirner*, 162 Wash.2d 493 (2007).

41.     The courts have further determined that liability for negligent misrepresentation applies in three situations: 1) the defendant knows of the injured party's reliance on their statements in choosing to take a certain course of action; 2) the plaintiff is a member of a group the defendant wishes to influence; or, 3) the defendant has a special reason to know that a member of a limited group will rely on the information. *Schaaf v. Highfield*, 127 Wash.2d 17 (1995) (quoting *Haberman v. Washington Public Power Supply System*, 109 Wash.2d 107 (1988)).

42.     The determination of a special relationship is a factual one. In *Haberman,* a company issued bonds to fund a nuclear power plant. The court reasoned that since the plant marketed to a specific, limited group of people (people wishing to invest in municipal bonds), and knew such people would likely rely on their information, a relationship existed so that an action for Negligent Misrepresentation could be supported. *Haberman v. Washington Public Power Supply System*, 109 Wash.2d 107 (1988).

43.     Here, LAVRY largely markets to a limited group, sound engineers and audiophiles, and knows or should know they will rely on the information provided, establishing the special relationship.

44.     The information provided by LAVRY, specifically, that if the switch is flipped one way it will mix audio in a way that is standard to the industry, while if it is flipped the other it will invert the mix, is false as it does not conform to the industry standard when in "normal" mode, but does when in "inverse" mode. It was, or should have been known by LAVRY at the time that the industry standard required was for the DA-10 to be used on the "inverse" setting.

45.     Defendant negligently failed to ensure that their equipment conformed to the current standard, or in the event it did not, inform the user of the deviation.

46.     Plaintiff relied on the information supplied by LAVRY when making his mixes, and his reliance was reasonable as Defendant was the manufacturer of the equipment.

47.     Finally, it is clear that Plaintiff relied on this information to his detriment, as he must now remix hundreds of tracks, thus causing his damages and satisfying all of the elements required for a Negligent Misrepresentation action.

48.     By reason of the foregoing, Defendants is liable in the amount of $583,000, plus attorney's fees and costs, as well as any equitable relief deemed appropriate by the court.

## COUNT THREE
## (BRECH OF DUTY OF GOOD FAITH AND FAIR DEALING)

49.     Plaintiff incorporates by reference all of the averments contained in Paragraphs "1" through "48" as if fully set forth herein.

50.     When determining if a duty exists, the court must also look to whom the duty was owed and what duty was owed. *Keller v. City of Spokane*, 146 Wash.2d 237 (2002).

51.     In the commercial context, at the very least there is a duty of good faith and fair dealing. Such duty "obligates parties to cooperate with each other so that each may obtain the full benefit of performance." *Badgett v. Sec. of State Bank*, 116 Wash.2d 563 (1991).

52.     The idea of a duty of good faith dealing is also seen in the Washington Consumer Protection Act as the failure to inform a consumer of a material fact is deceptive under the law. *Robinson v. Avis Rent-A-Car System, Inc.*, 106 Wash.App. 104 (WA Ct. of App. Div. 1 2001).

53.     LAVRY's failure to inform Plaintiff of their deviation from the accepted industry standard of the time was a breach of their duty of good faith and fair dealing.

54.     At the time the DA-10 was fabricated and sold to Plaintiff, the standard configuration for the industry was to use the second conductor of a balanced line for the positive polarity connection, and the third conductor for the return feed (referred to as "Pin 2+").

55.     In fact, this configuration only occurred when the operator switched the device to "inverse" rather than "normal."

56.     This information was not passed on to Plaintiff by LAVRY until ten (10) years after his initial purchase when he returned the device for servicing and was informed by the LAVRY technician.

57.     As LAVRY took no steps to inform Plaintiff of this deviation, KAY used his device for years in the "normal" mode, mixing audio that is defective and must be remixed.

58.     This remixing is estimated to cost Plaintiff at least $583,000, giving him ascertainable damages.  Thus, it is clear that LAVRY breached their duty of good faith and fair dealing, resulting in damages suffered by the Plaintiff.

59.     By reason of the foregoing, Defendant is liable to Plaintiff in the amount of $583,000, plus attorney's fees and costs, as well as any equitable relief deemed appropriate by the court.

## COUNT FOUR
## (VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT)

60.     Plaintiff incorporates by reference all of the averments contained in Paragraphs "1" through "59" as if fully set forth herein.

61.     In order to demonstrate a violation of the Washington Consumer Protection Act (CPA), three elements must be met: 1) defendant engaged in an unfair or deceptive act or practice; 2) the act or practice occurred during trade or commerce; 3) the act or practice impacts the public interest; 4) there was an injury to the plaintiff's business or property; and 5) the injury is causally related to the unfair or deceptive act. *Shields v. Morgan Financial, Inc.*, 130 Wash.App. 750 (WA Ct. of App. Div. 1 2005).

62.     An act or practice is deceptive when it has the "*capacity to deceive a substantial portion of the public.*" *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778 (1986) (emphasis in original). Furthermore, "knowing failure to reveal something of material importance is 'deceptive' within the CPA." *Robinson v. Avis Rent-A-Car System, Inc.*, 106 Wash.App. 104 (WA Ct. of App. Div. 1 2001).

63.     It is clear that in this case, the "invert/normal" switch was mislabeled. This mislabeling clearly possessed the capacity to deceive the public into thinking that placing the product into "normal" mode would make the recording conform to current standards.

64.     As the manufacturer specifically made the device and knew or should have known the current standard, their inaction in revealing the variance from the normal set-up represents knowing failure.

65.     The representation that the unit conformed to industry standard and failure to warn the consumer of the variance continued when the unit was sold to the consumer, placing it during the act of trade or commerce.

66.     In order to show the public interest prong of the action Washington Courts employ a three-prong test which requires: 1) the defendant induces the plaintiff to act or refrain from acting through unfair or deceptive acts or practices; 2) the plaintiff suffers damage due to this action or failure to act; and 3) the deceptive acts or practices have the potential for repetition. *Anhold v. Daniels*, 94 Wash.2d 40 (1980) (abandoned on other grounds).

67.     Under this test, LAVRY clearly induced Plaintiff through advertising and mislabeling, to not only purchase the unit, but use it on a particular setting ("normal") which was the inverse of the setting KAY needed to use it on. Plaintiff suffered damages due to the necessity of remixing associated sound recordings.

68.     Finally, because there is no evidence the label has been fixed on later models, nor that Defendant took any measures to inform other owners of the variation from the standard, there is a potential for repetition in this case. Thus, the *Anhold* test is satisfied as well as the third prong of a CPA claim.

69.     In fact, upon information and belief, and as evidence of their prior knowledge of the issue, LAVRY did attempt to correct any confusion without revealing the prior mislabeling of the DA-10 unit by labeling the "POLARITY" switch on newer or alternate models with "Pin 2+" or "Pin 3+".

70.     As to the forth prong of Plaintiff's CPA claim, KAY's property was injured by his inadvertent use of the incorrect polarity setting on the DA-10.

71.     As for the fifth and final prong of Plaintiff's CPA claim, as the injury would not have happened but-for the mislabeling and failure to warn of this deviation, Plaintiff's injury is causally and directly linked to the deceptive acts of LAVRY.

72.     By reason of the foregoing, Defendant is liable in the amount of $583,000, plus attorney's fees and costs, as well as any equitable relief deemed appropriate by the court.

## CONCLUSION AND DEMAND

**WHEREFORE,** Plaintiff, BENNY KAY, demands judgment as follows:

A.  On Count One, awarding damages to the Plaintiff, in an amount to be determined at trial but in no event less than $583,000 plus interest and attorney's fees;

B.  On Count Two, awarding damages to the Plaintiff, in an amount to be determined at trail but in no event less than $583,000 plus interest and attorney's fees;

C.  On Count Three, awarding damages to the Plaintiff, in an amount to be determined at trail but in no event less than $583,000 plus interest and attorney's fees;

D.  On Count Four, awarding damages to the Plaintiff, in an amount to be determined at trail but in no event less than $583,000 plus interest and attorney's fees; and,

E.  Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: New York, New York
May 30, 2019

**CARTER REICH, PC**

By: _  /s/ Carter A. Reich_
Carter A. Reich, Esq.
*Attorneys for Plaintiff*
BENNY KAY
116 Nassau Street, Suite 631
New York, New York 10038
(917) 615-0978
creich@reich.legal

**Exhibit "A"**

**AES14-1992**
(r2014)

- 7 -

**Table 2 - Connectors pin designations**

| Application and supply | Contact | | |
|---|---|---|---|
| | 1 | 2 | 3 |
| Single-channel, balanced | Screen (shield) | Positive polarity | Return |



Abstract from Table 2 on page 7 of AES 14-1992 (r2014) showing the standard for wiring of single channel, balanced connectors.   At plaintiff's facility, the Lavry DA-10 output connects to devices via two, single-channel, balanced, XLR connectors, diagram, above.

**Exhibit "A"**

**(continued)**



The above diagram illustrates how Lavry shipped its DA-10 unit with a standard of pin 3+ and pin 2- which is reverse polarity from the generally accepted AES standard.

**Exhibit "B"**



*Panel on the front of the Lavry DA-10 shows the "POLARITY" switch with two options: "normal" and "invert".   Lavry wired the DA-10 such that "normal" refers to pin 3+ and pin 2- whereas the AES standard is pin 2+ and pin 3- making the unit out-of-phase for normal wiring when in the "normal" position.*

**Exhibit "C"**



## CONFIGURING THE XLR OUTPUTS:

The unit is factory configured to operate in Balanced output mode. The balanced signal comes out PIN 2 and PIN 3 of the XLR outputs. PIN 1 is a ground connection for the cable shield. The unit may be configured (via internal jumpers) to drive Unbalanced signals.



*Text on page 2 of the Lavry DA-10 manual dated January 14th, 2008 and supplied to Claimant at the time of purchase.   Note that it fails to clarify whether configuration is Pin 2+ or Pin 3+ for standard operation.*

D. MONO and POLARITY:

Typically these switches are set to STEREO and NORMAL positions. Both MONO and INVERT can be selected during operation.

-MONO mode is provided for monitoring the impact of the stereo sound field. The MONO signal is the AVERAGE (sum divided by 2) of the L and R signals. This approach helps to preserve the perceived volume level when switching between STEREO and MONO while listening to typical stereo music program.

-The POLARITY switch affects the polarity of the reproduced audio waveform (which is sometimes referred to as "absolute phase"). This means that when in a system without any "polarity inversions," a recorded sound such as a drum beat is reproduced, the speaker will move towards the listener momentarily raising the pressure in the room, similar to the motion of the drum head. The perceived effect of incorrect Polarity can vary widely depending on the content of the music program.

-NORMAL position causes the XLR outputs pin 3 to be "non-inverting" (+) and XLR outputs pin 2 to be "inverting" (-).
-INVERT position results in XLR outputs pin 2 to be "non-inverting" (+) and the XLR outputs pin 3 to be "inverting" (-).
-The POLARITY switch functions in both balanced and unbalanced output operation, and is not related to the jumper settings. In the case of unbalanced operation, the XLR output pin opposite the "HOT" pin is GROUND, but the polarity of the "HOT" pin still follows the operation of the POLARITY switch.

*conflicting statements*

**Exhibit "D"**


On Tue, 6/26/18, Technical Support <techsupport@lavryengineering.com> wrote:
Subject: [#RPA-46027] Ticket replied: DA 10 / Lavry Blue - recap & testing
To: "Benny Kay" <afab2005@yahoo.com>
Date: Tuesday, June 26, 2018, 3:20 PM

Benny-

There was one other detail I wanted to tell you before I forget:

Unless you have special non-standard cables for the XLR outputs of the DA10, you should consider using the DA10 with the front panel Polarity switch set to "invert."… …Basically, the XLR's are "Pin 3 Hot" unless you set the FP [Front Panel] switch to invert.   This also affects the headphone output, and the signal is inverted unless the FP switch is set to invert…
.
Thanks,

Brad

With best regards,

Technical Support

------------------------------------------------------

Benny Kay <afab2005@yahoo.com>
To:help@lavryengineering.com
Jun 26 at 3:46 PM

Wow.  This sucks so bad.  What were you guys thinking?

**Exhibit "E"**



40 West 27th Street 7th Fl

New York, N.Y. 10001

212-366-6690 917-975-7502

www.shelterislandsound.com www.steveaddabbo.com

**Technical Report**

**Prepared by Steve Addabbo**

Date of test: September 7, 2018

Location: Kay Studio (Private)

The purpose of this series of tests was to ascertain if a certain piece of equipment

(Lavry DA-10 Two-Channel Digital to Analog Converter) was wired contrary to industry standards. And further to determine the negative impact of this anomaly.

**Background**: A digital converter is a piece of professional audio equipment that is widely used in audio production work.  Its purpose is to take analog audio program material and convert it to a digital stream of information that is stored and manipulated in computer-based Digital Audio Workstations (DAWs).

It is standard industry practice to observe a certain polarity and consistency in the wiring of studio equipment.  Engineers, both professional and semi-professional, depend on this consistency on a technical level and do not expect to have to scientifically test each piece of equipment before entering it into service.

**Objective**: To determine if the Lavry DA-10 (serial # 53480) was manufactured to an opposite phase polarity from industry standards.   The output connectors of the unit are standard 3 pin Male XLR Connectors.   These connectors have pins labeled 1, 2 and 3.   Normal industry standards set pin 1 at ground (also referred to as shield), Pin 2 as the positive (or hot), and Pin 3 as the negative

(return).   These connections are standard within the audio industry when using the "Balanced Line" method of signal transmission common in most recording studios.

**Test**: We took a two cycle burst of a 1000 cycle-per-second (HZ) sine wave in a typical "Pro Tools" session in a DAW.   We copied this sample and sent it simultaneously through the DA-10 and the Lavry 4496 (Containing three, two channel, Lavry MDA digital-to-analog converters).   We then re-recorded the outputs of all eight channels back into our session to compare the phase relationships.

**Results**: As shown in the following screen shot the DA-10 clearly puts the sine wave burst out-of-phase with the other unit and with the input source.



All wiring and patch bays in the studio are correctly wired using stock audio harnesses.   To double check, we moved the DA-10 to other inputs and the problem always followed the DA-10.

**Ramifications**: When used as a Digital-to-Analog Converter (D to A) the DA-10 reverses the phase of the output program material as compared to industry standards.   When audio mixing is done on a traditional "analog" board many discrete signals are combined (mixed) to create a final stereo master track.   The phase coherency of these signals contributes to a technically correct result.   With two channels out of phase (and in this case the stereo drum tracks) less than optimum results are obtained, especially in the low frequency content of the recording.

**Conclusion:** Simply put, loudspeakers and headphones etc. work by vibrating a diaphragm to move air molecules to create what we hear as music.   If there is out-of-phase, low-frequency content (like Bass and Drums trying to move the speaker in different directions) the sonics are compromised in a very discernible way.   Material mixed at Kay's facility has been negatively impacted by this defect of the Lavry DA-10.


Signed this 29th Day of September, 2018.

Steve Addabbo

**Exhibit "E"**

**(continued)**



March 20th, 2019

Benny Kay
224 East 70th Street, #7
New York, NY 10021

Estimate of Mixing Costs

The studio and engineering costs associated with re-mixing multi-track digital masters can typically range from $500 to $1500 per mix.   With a total of 583 mixes to be re-mixed, the total cost estimated at $1000 average per mix would total $583,000.   Other unanticipated costs could cause this figure to rise.

Steve Addabbo
Chief Engineer

40 West 27th Street, 7th Fl
New York, N.Y. 10001
212-336-6690   917-975-7502
www.shelterislandsound.com